UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

SHERRY M. ANWARI,       )
                        )
        Plaintiff   )
                        )
        v.          )   Case No. 2:06 cv 384
                        )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security )
                        )
        Defendant   )

<u>REPORT AND RECOMMENDATION</u>

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Sherry M. Anwari, on November 20, 2006. For the reasons set forth below, the court **RECOMMENDS** that the decision of the Commissioner be **REVERSED AND REMANDED.**

<u>Background</u>

The plaintiff, Sherry M. Anwari, applied for Supplemental Security Income and Disability Insurance Benefits on September 20, 2000 and August 30, 2001. (Tr. 82, 76)  These claims were denied without challenge. (Tr. 57, 61) Anwari again applied for Supplemental Security Income and Disability Insurance Benefits on June 7, 2002. (Tr. 692)  The claim was denied initially on October 28, 2002, and upon reconsideration on November 26, 2002. (Tr. 52, 57) Anwari requested a hearing before an Administrative Law Judge ("ALJ") on March 31, 2003. (Tr. 45)  A hearing before ALJ Richard Verwiebe was held on October 28, 2004, and vocational expert Michelle Pagella testified at the hearing. (Tr. 710)  On June 7, 2005, the ALJ denied Anwari's application by written

decision. (Tr. 21) Following a denial of her request for review by the Appeals Council on August 11, 2006, Anwari filed a complaint in this court on November 20, 2006. (Tr. 7, DE 1)

By the time of her Supplemental Security application in June 2002, Anwari, who worked as a home health aide and certified nursing assistant, underwent a dilation and curettage, hysteroscopy, and laparoscopy in response to a history of endometrial hyperplasia. (Tr. 273) On June 15, 2000, Anwari's treating physician, Dr. Sudhakar Garlpati, ordered x-rays in response to right hip and lower back pain. The x-rays indicated sacrilization at L-5, minor spondylolisthesis at L-5/S-1, and moderate disc space narrowing at L-4-5 and L-5/S-1. (Tr. 228) Anwari first saw Dr. Mitchell Mazurek on July 19, 2000, and he noted that Anwari experienced low back pain and intended to follow up with physical therapy after receiving results from the MRI which he ordered. (Tr. 464-465) During this period, Anwari also was examined by Dr. Alexander Miller, and Anwari indicated that she had attended 10 physical therapy sessions. (Tr. 193) She stated that the lifting exercises, treadmill, and stationary bicycle exercises aggravated her low back pain. (Tr. 193)

An MRI taken on July 26, 2000 revealed disc herniation at L4-L5 and disc extrusion at L5-S1. (Tr. 462-63) During rehabilitation services at Porter Memorial Hospital during this period, Anwari rated her back pain at 2 or 3 on a 10-point scale. (Tr. 196) On August 2, 2000, based upon the MRI results, Dr. Mazurek

ordered a four-week physical therapy program, during which period Dr. Mazurek ordered Anwari to remain off work. (Tr. 460)

In her initial evaluation with Nova Care Rehabilitation, Anwari indicated back pain that radiated to her right ankle. (Tr. 394) The physical therapist, Robert Hoyt, noted normal muscle strength in all muscle groups with the exception of the right hip and abdominal muscles, which graded 3-/5. (Tr. 394) Over the course of therapy, Anwari tolerated the exercises and responded well to therapy. (Tr. 387, 383, 382, 380)  On August 31, 2000, Hoyt indicated that Anwari was "much more active." (Tr. 383) One week later, Hoyt described Anwari's attitude as excellent and noted good progress on decreasing pain and increasing strength and range of motion. (Tr. 380)

Following this initial course of physical therapy, Dr. Mazurek ordered a second four-week period therapy on August 30, 2000. (Tr. 457) Hoyt again indicated that Anwari was improving but also indicated that "pool exercises seem to be the only sort of aerobic or long-term exercise that she tolerates." (Tr. 376) On September 25, 2000, Hoyt noted that after some initial gains, over "the last two weeks she seems to have lost what ground she gained." (Tr. 375) Two days later, Dr. Mazurek referred Anwari to Dr. Scott Andrews, an orthopedic surgeon. (Tr. 455)

Dr. Andrews determined that Anwari's condition was aggra-vated by the period of time over which she experienced her back pain and by her obesity, so he recommended that she undergo an epidural steroid before determining the course of further treat-

ment. (Tr. 265) There is no indication in the record that Anwari received this epidural steroid.

Around this time, on October 18, 2000, Anwari completed an administration form indicating that she sat most of the day and that within five minutes of walking, she experienced back pain and numbness in her legs. (Tr. 108) She noted that she sat down when she cooked and limited her driving to no more than 30 minutes. (Tr. 108)

Beginning November 24, 2000, Anwari underwent a series of exams at the Mayo Clinic which indicated some degenerative disc disease at L4-5 and L5-S1 "along with epidural lipomatosis in the lower lumbar and sacral region." (Tr. 318) Dr. Andrew Boon, at the Mayo Spine Center, reported that

> I really think weight loss is of paramount importance with regards to her generalized health as well as her potential for musculoskeletal problems and specifically for her current symptoms. Our management options are really very limited at this time. I discussed with her in detail today the reasons why I do not believe referral to one of our neurosurgeons for consideration of decompression is warranted at this time. I think she would have a high risk of perioperative morbidity due to her weight, particularly with regards to wound healing, and I think she has a very high chance that her symptoms could resolve completely just with weight loss alone.

> (Tr. 318)

In addition, Anwari's obesity also was reviewed during her examination at Mayo Clinic in conjunction with a past history of abuse as a child. (Tr. 316) Anwari reported that she had difficulty sleeping and concentrating and that she had endorsed

4

passive thoughts of suicide "but denied suicidal plan and intent." (Tr. 316) The possibility of bariatric surgery was raised, and Anwari was diagnosed with a history of depression, medically complicated obesity, and a Global Assessment of Functioning of 70. (Tr. 317) At the conclusion of the evaluation, Dr. Virend Somers indicated that Anwari's final diagnoses were back pain and herniated discs, ovarian cyst and dysfunctional uterine bleeding, hypertension, morbid obesity, and arthritis. (Tr. 308)

A physical residual function capacity assessment completed by Dr. T. Crawford on December 7, 2000, stated that Anwari could lift up to 20 pounds occasionally and 10 pounds frequently. (Tr. 349) In the RFC, Dr. Crawford stated that Anwari could sit, stand, or walk for six hours in an eight-hour workday and that she experienced only occasional postural limitations. (Tr. 349, 350)

Anwari returned to physical therapy in January 2001. On January 15, 2001, Hoyt indicated that for the first time, Anwari was tolerating the exercises well. (Tr. 362) However, on January 19, 2001, Hoyt indicated that Anwari would be discharged "unless major change in condition." (Tr. 360) On January 24, Dr. Mazurek discontinued physical therapy, noting that Anwari was scheduled to have a hysterectomy which occurred on January 24, 2001. (Tr. 448, 409) After post-operative follow-up, Anwari was treated briefly by a Dr. Sikand, and on May 30, 2001, Dr. Mazurek ordered another four-week period of physical therapy. (Tr. 447, 432-435) At the conclusion of this therapy, the physical therapist re-

ported that Anwari partially had met the goals of increasing
thoracic and lumbar spinal curves and increasing lower abdominal
strength and fully met the goals of increasing to 10 minutes her
ability to stand or ambulate without resting and to decrease
subjective pain reports to 3 on a 10-point scale. (Tr. 441, 442)

In August 2001, Anwari began treatment with Porter-Starke
Counseling Centers, reporting depression, insomnia, diminished
motivation, and feelings of helplessness. (Tr. 487) She also
indicated that she sought counseling to assist in considering the
option of bariatric surgery and was rated as having a GAF of 50
(Tr. 457, 490)

Anwari continued physical therapy in October 2001, and on
November 7, 2001, Dr. Mazurek authored a brief letter stating
that she "can only carry and lift up to 20 pounds for a short
period of time. Otherwise she cannot do it at all. She can only
walk, stoop, or squat for short periods of time." (Tr. 446) An
RFC completed on November 19, 2001, concluded that Anwari could
lift 20 pounds occasionally, lift 10 pounds frequently, sit,
stand, or walk for six of eight hours, and experienced only
occasional postural limitations. (Tr. 466-473)

On December 4, 2001, Dr. Lee Periolat with Porter-Starke saw
Anwari and made adjustments to her medications, discontinuing
Remeron and adding Vistaril and Imipramine. On December 21, 2001,
Anwari began treatment with Dr. Patrick Fleming who noted that
Anwari's medication included Lotensin, Prevacid, Premarin, Klor-
Con, Celebrex, Atenolol, and Doxazosin. (Tr. 503) Dr. Fleming

also noted that she had tried Imipramine and provided her with Zoloft samples. (Tr. 503)

In February 2002, Dr. Fleming again saw Anwari who indicated that her experience of panic attacks and depression improved after starting Zoloft. (Tr. 502) She continued taking Zoloft under Dr. Fleming's care, and in July 2002, began regular group therapy sessions through Porter-Starke Counseling. These sessions focused primarily upon Anwari's experience of childhood abuse. (Tr. 494, 550-553)

A third physical RFC was completed on September 11, 2002, again indicating an ability to sit, stand, or walk for six hours with occasional postural limitations and stating that Anwari could lift 20 pounds frequently and occasionally. (Tr. 510)

On November 12, 2002, Dr. Fleming again saw Anwari and noted that, though she experienced chronic mild to moderate depression, Anwari reported that she was doing much better. (Tr. 572) In response to complaints of tiredness, Dr. Fleming added Zyprexa to her medications. (Tr. 572) Two months later, Anwari told Dr. Fleming that she was not acutely depressed "but would like to work on adding something in addition to her Zoloft." (Tr. 570) She indicated that her depression had increased, but she denied suicidal ideation. (Tr. 570)

On May 14, 2003, consulting psychologist Dr. Robert Coyle performed a psychological examination of Anwari, consisting of numerous standardized tests. (Tr. 554) Dr. Coyle stated that the findings were "indicative of an anxious, depressed, withdrawn and

helpless individual that has no energy or drive. She is not ready to work at this time, but needs to be around people to improve her mental health." (Tr. 560)

On June 13, 2003, Anwari reported to Dr. Fleming that over the past three to four months, her depression had increased. (Tr. 568) Dr. Fleming planned to taper Anwari's use of Zoloft and start her on Lexapro. (Tr. 569) Two weeks later, Anwari told Dr. Fleming that switching to Lexapro had helped and that she had attempted to work 20 hours per week but had difficulty standing for a sufficient duration. (Tr. 566) In July 2003, Dr. Fleming added a prescription for Wellbutrin. (Tr. 590)

Records from Anwari's weekly therapy, which continued from September 2003 until near her hearing before the ALJ in October 2004, indicate that on September 5, 2003, Anwari reported suicidal ideation that had diminished by her September 10, 2003 session. (Tr. 608)

In September 2003, Dr. Fleming increased Anwari's Wellbutrin and noted that she had stated she felt she "would be better off not being alive." (Tr. 590) In October 2003, Dr. Fleming reported that Anwari's chronic anxiety and depression had improved on Wellbutrin. (Tr. 589) However, later that month, Anwari's therapy records indicate that her depression and anxiety had increased. (Tr. 604) During her January 9, 2004 visit with Dr. Fleming, Anwari said she had been sleeping more in response to her anxiety and depression. (Tr. 588) Dr. Fleming altered her medication, taking her off Wellbutrin and adding Effexor. (Tr. 588) In a

psychiatric assessment and treatment plan completed on behalf of Porter-Starke Counseling Centers on February 2, 2004, Anwari was advised to continue her treatment with Lexapro and Effexor under Dr. Fleming's care. (Tr. 622) One week later, Dr. Fleming indicated that Anwari was happy with the progress that had been made under this treatment. (Tr. 652) However, by the end of March 2004, records indicate that she experienced "vague suicidal ideation without intent or plan." (Tr. 596) Her diagnosis at the time included major depressive disorder and a GAF of 50. (Tr. 596)

In April 2004, Dr. Fleming characterized Anwari's depression as "still not stable," but under higher doses of Lexapro, she reached "the best she has felt in a long time." (Tr. 647) He also noted that Anwari appeared to go through a cycle in which she improved over a month or two and then went through another depressive spell. (Tr. 645) Within one month, on May 5, 2004, Dr. Fleming was contacted by Anwari's therapist who informed him that her depression had gotten worse and that she had become suicidal. (Tr. 645) That day, Dr. Fleming prescribed Geodon, a medication used in the treatment of schizophrenia and bipolar mania. At her therapy session one week later, Anwari indicated that Dr. Fleming had diagnosed her with Bipolar II disorder. (Tr. 632)

Anwari underwent a second consultative mental status exam on May 14, 2004 by clinical psychologist Dr. Robert J. Walsh. (Tr. 609) Anwari reported to Dr. Walsh that she recently had felt suicidal. (Tr. 609-610) Minnesota Multiphasic Personality Inventory results indicated elevation on the depression and psychas-

thenia scales. (Tr. 612) Dr. Walsh also stated that Anwari "has difficulty managing routine affairs . . . concentration problems and an inability to make decisions." (Tr. 612) In a medical source statement of ability to do work-related activities, Dr. Walsh noted slight limitations on Anwari's ability to understand and carry out simple instructions and moderate limitations on her ability to understand and carry out detailed instructions. (Tr. 616) Dr. Walsh further concluded that Anwari would experience moderate limitations in interacting with the public, supervisors, and co-workers. Also in May 2004, an additional MRI image of Anwari's spine was obtained that showed degenerative changes at L-4-5 and L5-S1. (Tr. 625)

In July 2004, brain MRI results included a reference to past history of demyelinating disorder but noted only "mild asymmetry." (Tr. 661) Additional tests conducted in August 2004 continued to reference demyelinating disorder and also found mild diffusion in her pulmonary function and normal results from somatosensory evoked response testing and brainstem auditory evoked response testing. (Tr. 655, 656)

In a letter provided on October 28, 2004, the date of her hearing before the ALJ, Anwari's therapist stated that she believed Anwari was incapable of performing normal daily functions as a result of "depression, anxiety, inability to focus, increase in suicidal ideation, desperation, confusion, and despair." (Tr. 684)

At the hearing before ALJ Richard Verweibe, Anwari indicated that she could stand only five to 10 minutes and could sit for 30 to 40 minutes before needing to get up and move around. (Tr. 714) The ALJ also asked if Anwari had "made any effort" regarding weight loss, stating "you'd probably feel better though if you lost weight, wouldn't you?" (Tr. 715) Anwari testified that she had difficulty taking care of her personal needs, noting that she showered only about twice a week because "it's hard to stand that long." (Tr. 721)  Anwari also testified that she drove to the hearing, an approximate 20 minute drive, but had difficulty driving more than 30 minutes. (Tr. 722)

The vocational expert, Michelle Pagella, testified that if Anwari were given full credibility, her depression combined with her physical limitations would require a conclusion that she was not capable of performing any jobs in the region. (Tr. 731) The ALJ also asked the VE to consider light work with a sit-stand option which, according to the VE, would erode the region's base of jobs by 80 percent. (Tr. 731) The VE stated that this equated to 2,000 positions matched to Anwari's capabilities. (Tr. 731) The VE further testified that Anwari's obesity would not affect this conclusion. (Tr. 732) The ALJ then asked to what degree Anwari's depression, as described in the mental RFC completed by Robert Walsh, would affect the number of jobs available. (Tr. 733) Pagella responded that the clerical and service jobs would be eliminated, leaving approximately 1,000 jobs at the light level and approximately 500 at the sedentary level. (Tr. 734)

In his decision denying benefits, the ALJ found that Anwari's conditions, including obesity, degenerative disc disease, and major depression, were severe but did not meet the criteria of any listing. (Tr. 23) The ALJ noted that Anwari "has remained able to ambulate effectively since the alleged onset date" but also noted her occasional use of a walker and Dr. Mazurek's conclusion that she could stand or walk for only short periods of time. (Tr. 23, 24)

The ALJ further indicated that Anwari did most household chores, provided she had five to ten minute rest breaks, and that her sister had indicated that she "microwaved food, did her laundry, drove, shopped and did some house cleaning with help." (Tr. 24) From this, the ALJ concluded that Anwari demonstrated "an ability to ambulate effectively with assistive devices in both hands." (Tr. 24)

Regarding depression, the ALJ noted that under Dr. Fleming's care, Anwari "responded well to Zoloft" and that he "adjusted the claimant's medications from time to time." (Tr. 26) He pointed to Dr. Fleming's February 2004 indication that Anwari was feeling better and did not report suicidal thoughts. (Tr. 26) The ALJ also characterized the letter from Anwari's therapist as "in contrast to Fleming's fairly positive report." (Tr. 26) The ALJ gave little weight to this letter because the therapist was not a licensed medical doctor. (Tr. 27) The ALJ also discounted the mental RFC completed by Dr. Coyle, in which he stated that Anwari was not capable of working.  The ALJ concluded that Dr. Coyle

"examined her only once" and that this was a particularly stress-
ful time in Anwari's life. (Tr. 27) The ALJ concluded that the
"record as a whole reveals mild restrictions of activities of
daily living." (Tr. 28) He noted that Anwari "cares for her per-
sonal need independently . . . watches television and movies
. . . [and] does housework with some breaks." (Tr. 28)

The ALJ described an RFC for Anwari that included an ability
to left or carry 10 pounds, the need for a sit-stand option, and
the need to accommodate moderate difficulties in remembering and
carrying out detailed instructions, making judgments, and inter-
acting with others. (Tr. 29) Based on the testimony of the
vocational expert, the ALJ concluded that Anwari was capable of
performing 350 assembler jobs and 200 hand packager jobs within
the regional economy. (Tr. 31)

## Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.").
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex
rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NLRB**, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. **Rice v. Barnhart**, 384 F.3d 363, 368-69 (7th Cir. 2004); **Scott v. Barnhart**, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." **Lopez**, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months."

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-tial evaluation to be followed when determining whether a claim-ant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claim-ant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if

she is not, the ALJ next addresses whether the claimant has a
severe impairment or combination of impairments which "signifi-
cantly limits . . . physical or mental ability to do basic work
activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the
ALJ determines whether that severe impairment meets any of the
impairments listed in the regulations. 20 C.F.R. §401, pt. 404,
subpt. P, app. 1. If it does, then the impairment is acknowl-
edged by the Commissioner to be conclusively disabling. However,
if the impairment does not so limit the claimant's remaining
capabilities, the ALJ reviews the claimant's "residual functional
capacity" and the physical and mental demands of her past work.
If, at this fourth step, the claimant can perform her past
relevant work, she will be found not disabled. 20 C.F.R.
§404.1520(e), §416.920(e). However, if the claimant shows that
her impairment is so severe that she is unable to engage in her
past relevant work, then the burden of proof shifts to the
Commissioner to establish that the claimant, in light of her age,
education, job experience, and functional capacity to work, is
capable of performing other work and that such work exists in the
national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f),
§416.920(f).

Anwari faults the ALJ for discounting the conclusions
reached in the consultative examination by Dr. Coyle and the
opinion expressed by her therapist, Gayle Sangster.

Under 20 C.F.R. §404.1527(d), an ALJ must evaluate every
medical opinion, regardless of its source. The regulation further

15

provides that "[u]nless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. §404.1527. These factors include the examining and treatment relationship between the medical source and the claimant, the frequency of the relationship, the support provided for the opinion, its consistency with the record as a whole, and whether the source is a specialist. 20 C.F.R. §404.1527(d)(1)-(6). Further, 20 C.F.R. §404.1513(d) provides that "other sources," though not "acceptable medical sources" may be used to show the severity of an impairment and its affect on a claimant's ability to function. *See also* **Smith v. Astrue**, No. 7-C-0955, 2008 WL 794518 at *6 (E.D. Wis. March 24, 2008); SSR 06-03p ("'Non-medical sources' who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time.").

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2). *See also **Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting **Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. §404.1527(c)(2); ***Clifford***, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony.  ***Schmidt,*** 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."). *See e.g. **Latkowski v. Barnhart***, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); ***Jacoby v. Barnhart***, 93 Fed. Appx. 939, 942 (7th Cir. 2004).  Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that while a treating physician

"has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." ***Hofslien v. Barnhart***, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

The ALJ's rejection of the mental RFC completed by Dr. Coyle included the recognition that "although Dr. Coyle is a psychologist, he examined the claimant only once." (Tr. 27) This detail, of course, is consistent with Dr. Coyle's status as a consultative examiner, as opposed to a treating source. In addition, the ALJ did not suggest that Dr. Coyle's opinion was somehow inconsistent with that of a treating medical source potentially entitled to controlling weight. Rather, the ALJ suggested that Dr. Coyle's opinion was faulty because, based on some unspecified factors, the ALJ concluded that Anwari was undergoing a particularly stressful period when Dr. Coyle conducted his examination. Not only did the ALJ provide little support for this assertion, the record indicates that at this time Anwari had reported both an increase in her depression and an increase in outside stressors, such as financial difficulties. In suggesting that these circumstances mandate discounting Dr. Coyle's opinion, the ALJ either took it upon himself to diagnose these stressors as the causes of her depression or engaged in a circular argument that Dr. Coyle's assessment of Anwari's depression was flawed because

she was depressed at the time he did the assessment. Neither is acceptable.

The ALJ also suggested that Dr. Coyle's test results were not consistent with his conclusions. However, while various verbal, reading, and math tests indicated average function, the MMPI-2, which the ALJ did not address, indicated both valid results and depression, anxiety, mental confusion, hysteria, and withdrawal. (Tr. 559) Finally, the ALJ suggested that Dr. Coyle's opinion could be discounted because at that time she was not "receiving the benefit of counseling as well as medication for mental health issues." (Tr. 27) However, the record indicates that at this time she was being treated both with medication and group therapy. (Tr. 494, 550-553, 570) The outright rejection of Dr. Coyle's opinion on this basis falls short of the requirements of 20 C.F.R. §404.1427.

Likewise, the ALJ's rejection of the opinion of Anwari's therapist, Gayle Sangster, was based on the fact that Sangster was not an "acceptable medical source" and a supposed inconsistency with Dr. Fleming's treatment records. Though Sangster was an "other source" according to the regulations, her records remain evidence entitled to consideration by the ALJ. In fact, in such circumstances, the regulations encourage viewing such opinions under the same factors as medical sources. *See* SSR 06-03p ("An opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to *outweigh the opinion*

19

*from a medical source*, including a treating source. For example, this could occur if the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole.")(emphasis added).

In addition, the ALJ's characterization of Dr. Fleming's records as showing some "ups and downs in moods, but generally only mild depression and anxiety," was inaccurate. In fact, these records consistently refer to Anwari's "chronic" depression and include adjustments to her medication such as prescribing Geodon, that were responses to suicidal ideation and a diagnosis of bipolar disorder. The ALJ noted that Sangster's records contain "only a few mentions of suicidal thoughts" and also noted that she "cares for her own personal needs independently . . . watches television and movies . . . [and] does housework." (Tr. 27, 28) In fact, the medical records indicate consistently that Anwari struggled to take care of her own needs, for instance showering only twice a week because she could not stand long enough to do more. In addition, Dr. Fleming's occasional recognition that Anwari had improved or responded well to medication does not demonstrate an inconsistency. *See **Bauer v. Astrue***, 532 F.3d 606, 2008 WL 2652887 at *2 (7th Cir. 2008)(noting that recognition that a plaintiff was "ok," her sleep fair, she was doing "fairly well," her "reported level of function was found to have improved," she had "a brighter affect and increased energy," she

"was doing quite well" must be made in recognition that "a person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days."). Accordingly, the ALJ improperly discounted the weight of this evidence. The ALJ correctly noted that Sangster's ultimate opinion that Anwari was disabled "is not binding on" him. (Tr. 27) However, this evidence was entitled to consideration consistent with 20 C.F.R. §404.1517 and SSR 06-03p.

Anwari also asserts that the ALJ improperly discredited her testimony. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Jens*, 347 F.3d at 213. The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997). However, an ALJ must provide "specific reasons" for the finding on credibility that are supported by the evidence in the case record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The reasons for the ALJ's finding cannot be implied. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). An ALJ's credibility determination is not entitled to deference where his findings were not explained in a way enabling meaningful review. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); Social Security Ruling 96-7p. Additionally, an ALJ's credibility

finding is not binding if it was based on errors of fact or logic. *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). An ALJ is precluded from ignoring testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. *Schmidt*, 395 F.3d at 746-47. If there is at least some medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). "If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits." *Carradine*, 360 F.3d at 754. In evaluating subjective complaints of pain when a claimant indicates that pain is a significant factor of her alleged inability to work:

> [T]he ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating

> factors, dosage and effectiveness of any pain
> medications, other treatment for relief of
> pain, functional restrictions, and the claim-
> ant's daily activities.  (Internal citations
> omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also Zurawski*, 245 F.3d at 887-88.  When an ALJ discounts a
claimant's complaints of pain because they are not consistent
with the objective evidence, he must be "sufficiently specific"
as to the weight given to the individual's statements and the
reasons for that weight.  *Zurawski*, 245 F.3d at 887.  "[T]he ALJ
must 'build an accurate and logical bridge from the evidence to
[his] conclusion.'" *Zurawski*, 245 F.3d at 887 (*quoting Clifford*,
227 F.3d at 872).

The ALJ stated that Anwari was only partially credible
regarding the extent of her pain and inability to stand for
prolonged periods. (Tr. 29) He agreed that she could not stand or
walk for six hours but apparently believed that she was capable
of sitting for six hours per day "with brief changes in position"
and "walking and/or standing no more than a total of two hours
per day." It is not clear what the ALJ intended by referring to
"brief changes in position" or what limits applied to the two
hour per day total.  These details were not made clear and
consequently leave the credibility determination without adequate
support. In addition, the ALJ did not provide the requisite
bridge between the evidence and these somewhat hazy conclusions.
The ALJ must "articulate specific reasons for discounting a

claimant's testimony." *Schmidt*, 395 F.3d at 746-47. Of course, as raised by Anwari in her final argument, these details also must be made clear to a VE.

---

For the aforementioned reasons, the court **RECOMMENDS** that the petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Sherry M. Anwari, on November 20, 2006, be **REVERSED AND REMANDED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties shall have ten (10) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court, with extra copies e-mailed to the Chambers of the Honorable Theresa L. Springmann, Judge of the United States District Court, Fort Wayne Division, and the Chambers of United States Magistrate Judge Andrew P. Rodovich, Hammond Division. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Incorporated*, 199 F.3d 902, 904 (7th Cir. 1999); *Johnson v. Zema Systems Corporation*, 170 F.3d 734, 739 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corporation*, 882 F.2d 258, 260-61 (7th Cir. 1989); *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 21st day of October, 2008

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge